**In re Gina Marie GIARRATANO, a/k/a Gina Comegys, Debtor.**

**Willard W. Webber, Jr., Plaintiff,**

v.

**Gina Marie Giarratano, a/k/a Gina Comegys, Respondent.**

**Bankruptcy No. 02–12126 MFW. Adversary No. 02–07138.**

United States Bankruptcy Court, D. Delaware.

Sept. 3, 2003.

Tiffany A. Poole, Rahaim & Saints, Attorneys at Law, Wilmington, DE, for Debtor.

Jeffrey S. Welch, Welch & Associates, Wilmington, DE, for Movant.

Jeoffrey L. Burtch, Cooch & Taylor, Wilmington, DE, Chapter 7 Trustee.

**MEMORANDUM OPINION** [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court are two matters filed by Willard Webber ("Webber"): a Com-

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant

plaint objecting to the dischargeability of his debt and a Motion to Dismiss the Debtor's bankruptcy case for bad faith filing. For the reasons set forth below, the relief requested by Webber will be denied.

## I. BACKGROUND

Webber hired Gina Marie Giarratano ("the Debtor") in 2000 as an administrative assistant. Both parties acknowledge that a romantic relationship between the two commenced shortly thereafter. During the course of the next eighteen months, Webber provided the Debtor with multiple checks totaling almost $61,000. The checks fall into three categories: monthly checks of $2,400; checks for specific purposes (such as Christmas presents and football camp); and a check for $12,000 that the Debtor said she needed to pay credit card debt incurred by her mother. The majority of these checks had the word "loan" written in the bottom left-hand "memo" portion of the check.

When the Debtor discontinued her personal relationship with Webber, Webber attempted to recover the money he had given to the Debtor. Webber filed civil suits to recover the money and to recover his personal property in the Debtor's possession.[2] Default judgments were entered against the Debtor when she did not attend either trial. On July 23, 2002, the Debtor filed a voluntary Chapter 7 petition. When the Debtor failed to appear for a hearing on July 24, 2002, in the state court actions brought by Webber, she was held in civil contempt and a bench warrant was issued for her arrest. The Debtor amended her bankruptcy schedules on July 25, 2002, to include Webber's judgments against her.

Webber filed a Complaint seeking a declaration that the debt owed by the Debtor was non-dischargeable pursuant to sections 523(a)(2)(A), (4) and (6) of the Bankruptcy Code. He also filed a Motion to dismiss the bankruptcy case for bad faith asserting that it was filed only to discharge his debt. A joint hearing on both matters was held on March 21, 2003, at which time the testimony of both Webber and the Debtor was presented.

## II. JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157(b)(1) and 28 U.S.C. § 157(b)(2)(A), (I) and (O).

## III. DISCUSSION

██ One of the primary purposes of the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh, free from the obligations and responsibilities consequent upon business misfortunes." ... This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (citations omitted). The concept of a "fresh start" is not unlimited, however, for it is only available to the "honest" debtor. *Id.* See also *Wright v. Union Cent. Life Ins.*

---

to Federal Rule of Bankruptcy Procedure 7052, which is also applicable to contested matters pursuant to Rule 9014.

**2.** Webber's personal property has apparently been recovered by him and is not the subject of the matters before this Court.

*Co.*, 304 U.S. 502, 514, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938)("The development of bankruptcy legislation has been towards relieving the honest debtor from oppressive indebtedness and permitting him to start afresh").

For the reasons set forth below, we conclude that the Debtor is entitled to a fresh start and Webber's requested relief is not appropriate in these circumstances.

## A. *Non–Dischargeability under Section 523*

■ The grant of a discharge is liberally construed in favor of the debtor while exceptions to discharge are strictly construed against creditors. *See In re Cohn,* 54 F.3d 1108 (3d Cir.1995). Under section 523, the burden is on the creditor to show the elements of an exception to discharge by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### 1. *Section 523(a)(2)(A)*

■ A debt may be held non-dischargeable under section 523(a)(2)(A) if it was obtained under "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). A party seeking an exception to a debtor's discharge under section 523(a)(2)(A) must prove that:

1. The debtor made the misrepresentations or perpetuated fraud;

2. the debtor knew at the time that the representations were false;

3. the debtor made the misrepresentations with the intention and purpose of deceiving the creditor;

4. the creditor [justifiably] relied on such misrepresentations; and,

5. the creditor sustained loss and damages as a proximate result of the misrepresentations having been made.

*See, e.g., Field v. Mans,* 516 U.S. 59, 70–71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)(holding that the proper measure for reliance is not the objective or "reasonable" standard, but a less demanding "justifiable" reliance standard). Justifiable (versus reasonable) reliance requires that we use a subjective rather than objective reasonable person standard; that is, we must take into account Webber's particular "qualities and characteristics." *Field,* 516 U.S. at 70–71, 116 S.Ct. 437. The justifiable reliance inquiry is essentially a "facts and circumstances" test of the particular case and particular creditor. *Id.*

#### a. *The Monthly Checks*

■ Webber asserts that the Debtor made misrepresentations to obtain money from him. Webber testified that the money in question was given as a loan rather than a gift. In support, he notes that the word "loan" was written on a majority of the checks. Webber further testified that the Debtor verbally agreed to this arrangement.

The Debtor, however, testified that there was never an understanding that the monthly checks were loans that would be repaid. To the contrary, the Debtor testified that the money was either a gift or Webber's contribution to shared living expenses. Thus, the Debtor testified that she did not represent that she would repay any of the monthly checks.

Many of the hallmarks of a loan are not present here.[3] There was no deadline to

---

**3.** The Bankruptcy Code does not expressly define a loan. The Second Circuit defined a

loan as "[a] contract whereby, in substance one party transfers to the other a sum of

repay the funds, nor was there an agreed upon repayment schedule or interest rate. The Debtor did not sign a written agreement evidencing a loan or an intent to repay the funds. Nor has Webber produced any extrinsic evidence that the Debtor verbally agreed to repay the amounts given to her.

The nature of the financial arrangement between the parties depends on ascertaining whose version is correct. Webber insists the monthly payments were loans; the Debtor insists they were gifts or a contribution to the monthly shared living expenses. After hearing both parties' testimony, we conclude that the Debtor is more credible. We believe her testimony that the money Webber gave her was a contribution to their shared living expenses. While Webber maintained a separate residence, he admitted that he spent several nights a week at the Debtor's house and that the Debtor fixed him dinner on other nights. Given their admitted romantic involvement, we do not believe that the monthly payments Webber made to the Debtor were loans.

Even if Webber were correct, however, he must establish more than that the funds given to the Debtor were loans. He must establish they were obtained by the Debtor by means of misrepresentations upon which he justifiably relied. He testified (in attempting to meet this standard) that the Debtor agreed to repay the loans when, in fact, she had no ability to repay them since she did not have a job during much of the time. However, Webber could not have relied on such a representation. He was the Debtor's boss (and paramour) during

this time and was well aware of her financial condition. Webber knew the Debtor did not have the means to repay the monthly checks he gave her. If the Debtor had had sufficient funds to pay her bills, she would not have needed to "borrow" the funds from him.

Further, the Debtor testified that Webber encouraged her not to work outside of the home. According to her, it was Webber who insisted she quit her job (as an assistant to him) and not get another job.[4] In fact, it was when the Debtor obtained another job that her relationship with Webber suffered. Given the Debtor's financial condition and lack of a job, Webber cannot establish the requisite justifiable reliance on any promise to repay, even if the Debtor had agreed to repay the "loans."

Therefore, we conclude that the monthly checks were not a loan and the Debtor did not agree to repay them. Furthermore, even if they were loans and the Debtor had agreed to repay the monthly checks, Webber did not establish that he justifiably relied on the Debtor's promise to repay the money.

b. *The Specific Purpose Checks*

■ In addition to the monthly checks of $2,400 each, Webber testified that on occasion he lent the Debtor money for specific purposes, including to change the Debtor's locks (after her husband moved out), to pay for football camp for her son, to pay for her dog's veterinary expenses, and to buy Christmas gifts. The Debtor testified that these were all gifts; Webber says they were loans.

money that the other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form." *In re Grand Union Co.,* 219 F. 353, 356 (2d Cir.1914).

4. Although the Debtor ceased her employment with Webber, she continued to do work for him from her home, by creating and maintaining a website for his business. She was not paid for that work, however.

Again, we find the Debtor's testimony more credible. It is inconceivable that a person in a romantic relationship with another would give her money to buy Christmas gifts for herself and her son with the expectation of being repaid! We similarly conclude the other specific purpose checks were gifts rather than loans.

### c. *The $12,000 Check*

 Webber asserts and the Debtor admits, however, that misrepresentations were made by her regarding the reason for the $12,000 check. This check was the first one given to the Debtor by Webber early in their personal relationship. The Debtor admitted she told Webber that the money was to pay a debt that the Debtor's mother had accrued on the Debtor's credit card. The Debtor, however, paid only $2,000 of the funds to her mother (and not because of any credit card debt). The remainder was used by the Debtor to pay her husband to move out of the house and for miscellaneous living expenses. Accordingly, there is no dispute that the Debtor misrepresented the purpose of the $12,000 check and that she knew the misrepresentation was false when made.[5]

In order to prevail, however, Webber must demonstrate that he justifiably relied upon the Debtor's misrepresentation. We conclude that the necessary element of justifiable reliance is missing here. Webber offered no proof that he would not have given the Debtor the money except to pay the obligations incurred by her mother. Given the fact that he later gave the Debtor almost $50,000 for many other purposes, we cannot conclude that Webber would not have given her the initial check

had he known its true purpose. We, therefore, conclude that Webber has not proven that he justifiably relied upon the Debtor's misrepresentation about the use of the funds.

 Webber also asserts that the Debtor misrepresented her intent to repay the $12,000 check. While misrepresentation of an intent to perform can give rise to grounds for non-dischargeability, mere failure to perform a promise is not sufficient. *Compare AT & T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 407–08 (5th Cir.2001)(explaining that misrepresentation of intent to perform can be grounds for non-dischargeability) *with In re Scarlata*, 979 F.2d 521, 525 (7th Cir.1992)(holding that failure to perform is not a misrepresentation if intent to perform was present when the promise to pay was made) (citing *Prosser on Torts*, § 109, at 764–65 (5th Ed.1984)).

 In this case, the Debtor admits she did represent to Webber that she would repay the $12,000 check. Webber fails, however, to produce any evidence that the Debtor's representation of intent was, in fact, a misrepresentation when it was made. Webber simply relies on the fact that the Debtor has made no payments on account of the $12,000 check. This is insufficient to establish that, at the time the loan was made, the Debtor did not intend to repay it. Webber's position is also somewhat disingenuous, because he actually refused the Debtor's offer of a repayment plan at $100 per month (an amount the Debtor could afford once she regained employment). As a result, Webber failed to carry his burden of proving the Debtor misrepresented her intent to repay the loan.

---

**5.** We do not accept the Debtor's argument that her misrepresentations regarding the purpose of the $12,000 check were "statements respecting the debtor's or an insider's financial condition," which are expressly ex-

cepted from section 523(a)(2)(A). The use that the Debtor intended for the funds is not a statement respecting her (or her mother's) financial condition or her (or her mother's) ability to repay the loan.

Furthermore, Webber again failed to establish he justifiably relied on the Debtor's alleged misrepresentations (as to the purpose of the loan or her intent to repay it). *In re Nahas* provides an example of reasonable reliance. 92 B.R. 726 (Bankr. E.D.Mich.1988).[6] In *Nahas*, the Court found that a bank reasonably relied upon a debtor's prior good payment history to expect repayment when it continued to extend credit after the debtor failed to remit several payments. *Id.* As a result, the bank's later advances were held to be non-dischargeable under section 523(a)(2)(A). *Id. See also First Bank Sys. v. Foley (In re Foley)*, 156 B.R. 645 (Bankr.N.D.1993).

Such a situation is not present here. Webber lent the $12,000 before he had any financial history with the Debtor. Further, although the Debtor had not made a single payment on the $12,000 loan, Webber continued to write checks to her (ultimately totaling $61,000). Webber only ceased doing so after their personal relationship ended. Unlike *Nahas*, there was no positive financial history between the two parties. In fact, there was no payment history at all because the Debtor never repaid Webber any money.

Additionally, as the Debtor's employer and romantic interest, Webber was in a singularly unique position to know (and control) her financial position, including exactly how much money the Debtor was earning. Under the facts and circumstances of this case, Webber could have had no expectation of repayment knowing the amount given and the Debtor's financial situation. Accordingly, we conclude that Webber did not justifiably rely upon the purpose for the loan or any promise to repay it.

Because we conclude that Webber has not met the standards under section 523(a)(2)(A) with respect to the $12,000 check, Webber's complaint to except that debt from discharge must also be denied.

### 2. *Section 523(a)(4)*

■ Section 523(a)(4) provides a debt is not dischargeable if it was incurred through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). A creditor must establish non-dischargeability under this section by a preponderance of the evidence. *Grogan*, 498 U.S. at 287–88, 111 S.Ct. 654.

■ Webber presented no proof that the Debtor was acting in any sort of fiduciary capacity with respect to any of the money that he gave her. Accordingly, Webber has not met his burden under the first prong of this barrier to discharge.

■ With regard to the embezzlement or larceny prong, no fiduciary capacity is required for this exception to discharge. *See, e.g., Cadle Co., II, Inc. v. Hartman (In re Hartman)*, 254 B.R. 669, 674 (Bankr.E.D.Pa.2000). However, both tests do require a showing of fraudulent intent. *In re Weber*, 892 F.2d 534, 538 (7th Cir.1989)(defining "embezzlement" under section 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come"). *See also In re Brady*, 101 F.3d 1165, 1172–73 (6th Cir.1996)(same); *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661, 662 (8th Cir. 1988)(same); *Hartman*, 254 B.R. at 674 (explaining that larceny has a similar fraudulent intent requirement but with added elements).

■ In this case, with respect to the monthly checks and the specific purpose

---

**6.** While the *Nahas* court utilized the more exacting "reasonable" reliance standard rather than "justifiable" reliance, the case provides a useful framework for analyzing the case at hand.

checks, our previous finding that those funds were gifts or contributions to living expenses negates any argument by Webber that there was any sort of fraud by the Debtor. Indeed, there can be no finding that there was any sort of "appropriation" or "taking." Once Webber made the gifts or contributions, he relinquished title and there could be no restrictions on how the Debtor used the funds. Accordingly his complaint for exception to discharge under section 523(a)(4) with respect to those funds must be denied.

The $12,000 check, however, requires a closer look. Embezzlement exists when property originally comes into the perpetrator's possession lawfully but the perpetrator subsequently uses it for himself. *See, e.g.,* 4 Collier on Bankruptcy ¶ 523.10[2] at 523–76 (15th Ed. Rev.1997); *Hartman,* 254 B.R. at 674; *Davis v. Kindrick (In re Kindrick),* 213 B.R. 504, 509 (Bankr.N.D.Ohio 1997). In this case, the Debtor was not entrusted with the funds to hold for Webber; the funds were given to her by Webber to use to repay her credit card debt. Accordingly, we cannot conclude the Debtor embezzled the funds pursuant to section 523(a)(4).

Larceny requires that the funds originally come into the Debtor's hands unlawfully. *Hartman,* 254 B.R. at 674 (holding that felonious intent must have existed at the time of the taking and the taking must have been unlawful or without the consent of the owner); *see also* 4 Collier on Bankruptcy ¶ 523.10[2] at 523–76 (15th Ed. rev.1997)(defining federal common law larceny as "felonious taking of another's personal property with intent to convert it or deprive the owner of same"); *Black's Law Dictionary* at 885 (7th Ed.1999)(defining "larceny" as "the unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it permanently").

While the Debtor did admit to misrepresenting her purpose for the money, we conclude that such misrepresentation does not rise to the requisite intent to support common law larceny. The Debtor testified she never intended to deprive Webber of the $12,000 permanently. She testified that she fully intended to repay the money and Webber admits she offered to repay it at the rate of $100 per month. In short, the Debtor intended her misrepresentation to induce the check being written, but did not intend it to result in depriving Webber of the money forever. Thus, Webber's complaint for an exception to discharge under the larceny prong of section 523(a)(4) with respect to the $12,000 check must be denied.

### 3. Section 523(a)(6)

Section 523(a)(6) provides that "willful and malicious injury by the debtor to another entity or to the property of another entity" is a basis for non-dischargeability. 11 U.S.C. § 523(a)(6). The Third Circuit has defined "willful and malicious" actions within section 523(a)(6) as "those actions [which] were substantially certain to result in injury or where the debtor desired to cause injury." *Conte v. Gautam (In re Conte),* 33 F.3d 303 (3d Cir.1994). Once again the creditor's burden is a preponderance of the evidence. *Grogan,* 498 U.S. at 287–88, 111 S.Ct. 654.

In this case, Webber asserts that the Debtor willfully and maliciously caused pecuniary harm to Webber. Based upon our finding that the monthly checks and specific purpose checks were gifts or contributions, Webber's assertion of willful and malicious injury cannot stand. A giver of a gift cannot successfully argue that the recipient of the gift "willfully and maliciously" harmed him by accepting it. Accepting payment of shared expenses also cannot be characterized as "willful and ma-

licious." Accordingly his complaint for exception to discharge with respect to those amounts must be denied.

■ The Debtor testified that a portion of the $12,000 was used for living expenses, another portion to pay for her ex-husband to move out of the house, and a third portion given to her mother. The use of the money for living expenses and to pay for her husband to move out were made to further the relationship she was developing with Webber. The Debtor testified that she misrepresented the purpose of the loan because she was embarrassed to tell Webber about the severity of her husband's substance abuse problems and debts. The circumstances do not show a willful or malicious intention on the part of the Debtor. The Debtor did not intend injury to Webber; if anything, her actions were to promote her relationship with Webber.

As a result, we conclude that Webber has not shown the Debtor's actions to be "willful and malicious." His complaint for an exception to discharge under section 523(a)(6) is denied with respect to the $12,000 check as well.

### B. *Bad Faith*

■ Webber also seeks dismissal of the Debtor's bankruptcy petition under section 707(a) for bad faith. 11 U.S.C. § 707(a). While section 707(a) does not list bad faith as a reason for dismissal of a petition, the list is not considered exhaustive and bad faith is a valid basis for dismissal of a bankruptcy case. *See, e.g., In re Tamecki,* 229 F.3d 205 (3d Cir.2000). Dismissals for bad faith are narrowly construed and "utilized only in those egregious cases that entail ... lavish lifestyles and intention to avoid a large single debt upon conduct akin to fraud." *Id.* at 207.

■ Once brought into question, the Debtor has the burden of proof to show her good faith. *Id.* at 207. The

Bankruptcy Code does not expressly define what constitutes "good faith." At the very least, though, good faith requires a showing of "honest intention." *Id.*

■ In this case, the debts appearing on the Debtor's schedules are not indicative of a "lavish lifestyle" or a systematic pattern of compiling debts with the express purpose of gaining a discharge to avoid paying the amounts owed. The Debtor listed eleven creditors in addition to Webber and debt (excluding the amount owed to Webber) of $13,620.34. The majority of these debts are for medical bills, utility bills, rent, and similar living expenses. The monthly checks and specific purpose checks comprise the bulk of Webber's claim and that money was also used for typical monthly living expenses and other mundane expenditures. None of these debts are examples of a "lavish lifestyle" or excessive and continued expenditures.

Webber asserts in his Motion to dismiss that it was "questionable" whether the Debtor would have filed for bankruptcy in the absence of the debt owed to Webber. However, the Debtor testified that she would have been forced to file for bankruptcy even if she had not had the civil actions brought by Webber against her. The Debtor's financial position and the debts owed to other creditors support her assertion.

Although Webber is a substantial creditor, he is by no means the sole creditor and the amounts that the Debtor owes others are not insignificant. Accordingly, we conclude the Debtor had an "honest intention" in filing her petition and thereby met her burden of showing good faith. As a result, Webber's motion for dismissal of the Debtor's chapter 7 petition is denied.

### IV. *CONCLUSION*

For the foregoing reasons, the Complaint of Non–Dischargeability of Debt and

Motion for Dismissal Due to a Bad Faith Filing will both be denied. The Debtor is entitled to a fresh start.

An appropriate Order is attached.

### ORDER

AND NOW, this **3rd** day of **September, 2003,** upon consideration of Webber's Complaint of Non–Dischargeability and Motion to Dismiss due to Bad Faith, and the Debtor's Responses thereto, it is hereby

**ORDERED** that the Motion to Dismiss is **DENIED,** and it is further

**ORDERED** that the debt owed by the Debtor to Webber is **DETERMINED TO BE DISCHARGEABLE** pursuant to 11 U.S.C. § 523(a); and it is further

**ORDERED** that the Adversary Proceeding shall be **CLOSED.**