# United States Court of Appeals

## For the First Circuit

No. 09-1572

IN RE: ALEXANDER SHERMAN,

Debtor.

ALEXANDER SHERMAN,

Appellant,

v.

IGOR POTAPOV, ET AL.,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris,  U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter, Associate Justice,* and Stahl, Circuit Judge.

Evan Fray-Witzer, with whom Law Office of Evan Fray-Witzer was
on brief, for appellant.
Edward J. Fallman for appellees.

April 21, 2010

---

*     The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER**, **Associate Justice**. The appellant, Alexander Sherman, and appellee Igor Potapov were among the five principals in the Global Financial Group, Inc., which purchased a financial management firm, Whitehorne and Co., Ltd. Potapov himself had an account there and maintained one as agent for appellee B.A. Makden Corporation.

Whitehorne steered three other clients into short positions in technology stocks while that market sector was booming, and when the shorted stocks' continuing appreciation led to margin calls, neither the three accounts nor their owners nor Whitehorne itself had the money to respond. Another Whitehorne principal, Irina Dunn, managed to obtain the approval of the firm's clearinghouse to reassign the disastrous investments ("rebill," in the industry euphemism) to the liquid accounts of Makden and Potapov, who was abroad at the time. The move rescued the three investors and kept the Whitehorne doors open for a time, but cost the victims nearly $983,000.

Potapov's discovery of the chicanery led to claims of conversion, fraud and other defalcations by him and Makden against Sherman and others, which were arbitrated under the rules of the National Association of Securities Dealers. The arbitrators found for the claimants in a general order that imposed joint and several liability on the named Whitehorne principals, including Sherman and Dunn. They promptly declared bankruptcy to escape the arbitration

award but were met with adversary claims by Potapov and Makden that the awards were immune to bankruptcy relief under the provision of 11 U.S.C. § 523(a)(4), which exempts from discharge any obligation resulting from the debtor's embezzlement. When the bankruptcy court denied discharge, the Whitehorne principals appealed to the district court, In re Dunn, No. 06-cv-10630-PBS (D. Mass. Feb. 27, 2007). The district judge read the arbitration award as necessarily resting on a finding that Potapov had not authorized the rescrambled transactions, but vacated the decree of non-discharge and remanded for further proceedings to determine whether any of the bankrupts had effected a conversion of the victims' assets, and if so to determine whether the one or ones responsible had acted with the intent necessary for embezzlement. After that, the members of the Whitehorne group settled the adversary claims, save for Sherman.

On remand, the bankruptcy court found that the crisis created by the margin calls was placed before all the Whitehorne principals then in residence, each of whom understood the rebilling maneuver that Dunn would succeed in persuading the clearinghouse to accept. The court specifically found that the only one of the Whitehorne people still before the court, Sherman, had committed embezzlement. Accordingly, the bankruptcy court again denied discharge of the $983,000 debt, and was upheld on the second trip to the district court, from which this appeal is taken.

Although Sherman argues that he was never found personally liable for conversion of the victims' accounts, that is simply at odds with the bankruptcy court's findings and rulings. The bankruptcy judge stated that in order to bar discharge for embezzlement, it was necessary to find that the debtor appropriated the victims' property for his own benefit with fraudulent intent. That is a substantially correct statement of law, and the judge's statement of conclusions make it clear enough that he found the elements necessary to hold Sherman responsible as an embezzler.

There being no definition of embezzlement in § 523 or elsewhere in the Bankruptcy Code, we assume that Congress wrote with the common law in mind, Neder v. United States, 527 U.S. 1, 23 (1999), and United States v. Young, 955 F.2d 99 (1st Cir. 1992), will suffice for an explanation of the traditional elements of embezzlement. Embezzlement is "the fraudulent conversion of the property of another by one who is already in lawful possession of it." Id. at 102 (internal quotation marks omitted). Thus, to amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent, and the question is whether the bankruptcy court found it on Sherman's part. Young is helpful again, in its example of embezzlement by using entrusted money for the recipient's own purposes in a way he knows the entrustor did not intend or authorize. Id. It is knowledge that the use is devoid of authorization, scienter for short, see Palmacci v.

Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997), that makes the conversion fraudulent and thus embezzlement, and it is just this knowledge that the bankruptcy court found that Sherman had as a participant in the conversion. The judge found that the principals at the Whitehorne office were aware of the problem and of the expedient Dunn proposed. Their positions in the company necessarily gave them power over its actions, and there is no evidence that Sherman objected or distanced himself in any way from the course of action proposed and taken in the firm's name; the district court fairly characterized these facts as showing that Sherman was "directly involved" in the rebilling.

While it is true that the bankruptcy judge did not make an express finding that Sherman knew the action being taken was unauthorized (as the arbitrators had necessarily found), the judge's conclusion leaves no doubt that he did so find. He spoke of the elements of embezzlement as appropriation of another's property for one's own purpose with fraudulent intent, and he could hardly have found Sherman liable of fraudulent appropriation without finding knowledge that authorization was wanting. The bankruptcy court's findings could have been expressed better, but on this point they cannot be seriously doubted.[1]

---

[1] Because Sherman was found liable in his own right, there is no occasion to consider any issue of statutory imputed liability under federal securities laws.

Sherman argues that knowledge of the unauthorized rebilling is not enough to hold him to his debt under § 523, however, because of another finding, that Dunn acted with the object of keeping Whitehorne in operation and said as much to the other principals as she prepared to victimize the solvent accounts. In fact, the bankruptcy court was prepared to credit Dunn's testimony that saving the company was an object of Whitehorne's transfers, but found it irrelevant. Sherman calls this error, on the authority of cases holding that a purpose of saving the debtor's company is a defense to the application of the embezzlement exception to bankruptcy discharge, see, e.g., In re Littleton, 942 F.2d 551, 556 (9th Cir. 1991); In re Fox, 370 B.R. 104, 117 (B.A.P. 6th Cir. 2007), a position consistent with the general bankruptcy policy of allowing debtors to make a fresh start, see, e.g., In re Baylis, 313 F.3d 9, 17 (1st Cir. 2002).

But Sherman's argument is weaker than his list of supporting citations would suggest. To begin with, a number of his cases deal not with entrusted funds, as here, but with a debtor's obligation to repay loans out of business proceeds, see, e.g., Littleton, 942 F.2d at 552; In re Hartman, 254 B.R. 669, 671-72 (Bankr. E.D. Pa. 2000). More directly to the point, however, is the tension between the save-the-company defense and the terms of the statute. It provides that there will be no discharge for "any debt . . . for . . . embezzlement," § 523(a)(4). Nothing in the

-6-

text narrows the traditional notion of embezzlement, and Sherman points to nothing in the legislative record suggesting that something more limited than common law embezzlement was intended. The essence of the common law concept is knowing use of entrusted property for an unauthorized purpose; there is no exception for financial joyriding, see Young, 955 F.2d at 104 (unauthorized "borrowing" with intent to repay is still embezzlement, the borrowing being unauthorized), and nothing like a Robin Hood limitation excusing defendants who misuse the entrusted property of the solvent in order to save a poor company. Indeed, any excuse for such a state of mind would be perverse here; saving the company meant saving Sherman along with it (and not even Robin Hood could have found Whitehorne, Sherman and the three luckless investors more deserving than the victims whom chance, or their own prudence, had spared from Whitehorne's bad bet). Thus, a general rule of narrow construction for anti-discharge provisions does not neutralize the anomaly Sherman cries for; nor have we heard any answer to the focused question, why Congress would have wished to bar application of an anti-discharge provision for the benefit of a debtor who knowingly violates the terms of his authorization to use the property of another. There is no good reason against applying the statute straightforwardly.

Sherman also claims that the district court stepped out of bounds in finding facts, as a court sitting in an appellate

capacity is not empowered to do.  But there is no need to get into this.  The issue on remand to the bankruptcy court was whether Sherman committed embezzlement, and the trial court found he did. Any other facts, by whomever found, are beside the point in this appeal.

The judgement of the district court is **affirmed**.